## Case No. 15,883.

### UNITED STATES v. NINE HUNDRED BASKETS OF CHAMPAGNE.

[Nowhere reported; opinion not now accessible.]

---

## Case No. 15,884.

### UNITED STATES v. NINE PACKAGES OF LINEN.

[1 Paine, 129.] 1

Circuit Court, D. New York. April Term, 1818.

CUSTOMS DUTIES—FRAUDULENT ENTRIES—INCORRECT ENTRIES—MISTAKE—EXCUSE.

1. Where goods are libelled under the sixty-seventh section of the law for the collection of duties [1 Stat. 677], for disagreeing with the

1 [Reported by Elijah Paine, Jr., Esq.]

entries, and the claimant sets up mistake as an excuse, the circumstance that probable cause of seizure has been made out, does not impose on the claimant the necessity of making out an unusually clear case of mistake. All he has to do is to produce ordinary proof.

[Cited in U. S. v. The Governor Cushman, Case No. 5,646.]

2. Circumstances must be of a controlling and irresistible nature to justify a disregard of positive testimony.

3. It was holden a sufficient and legal excuse for an incorrect entry of goods, that they were entered from an invoice made out in great hurry and agitation, while the goods were packed at Caen, in the absence of the owner, in order to secure them by removal from an apprehended pillage by the Prussian soldiery, who occupied the place.

[Cited in U. S. v. The Governor Cushman, Case No. 5,646.]

[Appeal from the district court of the United States for the Southern district of New York.]

This was an appeal from a sentence of the district court of the Southern district of New York. A part of the goods libelled, had been condemned, and a part restored in the district court [case unreported], and both the libellants and claimant appealed from the decree.

The cause of forfeiture alleged in the libel was, that the goods which had been imported from France, were entered at the custom-house at less than their real quantities. It was alleged that nine packages of linen, two packages of silk, two packages of crapes, two packages of gloves, one package of stockings, one package of linen and napkins, one package of flounces, two packages of shawls, and twelve packages of clocks, were on suspicion of fraud opened and examined in the presence of two respectable merchants, and found to contain greater quantities than the quantities at which they were entered. The difference in the quantities as stated, amounted to from one-half to one-sixth in the dry goods, and the twelve cases of clocks which were entered as containing twelve clocks were stated to have contained nineteen.

The defence set up in the claim of William Vintroux Hersan, was, that the goods were not incorrectly entered with the intention of defrauding the revenue, but in consequence of mistake and accident. That the goods were packed at Caen in France, when that place was in possession of the Prussians and threatened with pillage, in great haste and confusion for the purpose of removal, and that if the entry was wrong, it was owing to this circumstance. That a large part of the merchandise imported had been found on examination to contain no more than the quantity at which it was entered. William Vintroux Hersan claimed the clocks as the property of John Louis Vintroux of Paris, and the rest of the goods as his own property.

A great number of witnesses were examined in the cause on both sides, some of them re-siding at home and others abroad, for the purpose of showing the circumstances under which the goods were purchased, packed up and sent to America, their situation here both before and at the time of the seizure, and the variation of the real quantities from the invoice and entries.

There were thirty-three packages of goods libelled. These packages were a part of seventy-two packages or boxes, with various marks, shipped by the claimant (who came with them) at Havre, in the ship Ann Williams, about the 1st of October, 1815, and consigned to Joseph Bouchaud of New York. On their arrival at New York, some delay in entering them was occasioned by a variation between the marks of two or three packages in the invoice and bill of lading. After the entry was made, a part of the goods were sent to Bouchaud's store and a part remained at the public stores. A part of those sent to Bouchaud's store were also removed to the house where the claimant lived, for the purpose of being unpacked and exposed for sale. While the claimant was engaged in unpacking them, the whole were seized for the causes alleged in the libel. Examiners were appointed by the collector to ascertain the real quantities contained in the packages. The thirty-three packages libelled were found to exceed the quantities at which they were entered, as stated in the libel. The rest of the seventy-two packages were found correct. Of the packages libelled, ten contained linen, and twelve contained clocks. These were condemned in the district court. The remaining eleven packages, containing crapes, silk goods, gloves, shawls, and stockings, were acquitted.

The excuse set up by the claimant was, that there was no intention to defraud the revenue, but that the variances in quantity were the result of accident. It appeared that the claimant kept a dry goods and jewelry store at Caen in France. He left that city for Paris about the 25th of August, 1815, to buy goods. France was then in the possession of the allied armies, and goods were very low. In the course of the month, he bought and sent considerable quantities of goods to Caen, intending them for the United States. About the 1st of September, learning from his wife that the Prussians, who then occupied Caen, were committing great excesses, and threatening the city with pillage, he sent her word to pack up all the goods in his store with as much haste as possible and send them immediately to Havre, to be shipped for the United States. The claimant remained in Paris. John Louis Vintroux, the father of the claimant, who lived at Paris, had consigned at one time a box containing six clocks, and at another time a box containing twelve clocks, to the claimant at Caen for safety; the troops at that time occupying Paris, but not Caen. He also learning the state of things at Caen, wrote Madame Vintroux, directing her to send the eighteen clocks to Havre, to be

shipped for the United States. He at the same time sent her an invoice of the clocks, footing the amount of each consignment separately. The claimant disclosed his proceedings to several persons then in Paris, and who afterwards came over with him to this country.

At Caen there were twenty thousand Prussians and Cossacks, and from six to fifty Prussian soldiers were quartered on each citizen. Their presence is described to have been troublesome, alarming, and dangerous in the highest degree. They threatened to pillage the place, and it was once published in the Paris gazettes that it had been pillaged. Affrays continually occurred between the troops and citizens. The inhabitants hid their goods in the cellars and buried their valuables. Many secretly built partitions in their cellars, behind which they packed up their goods and sent them away. Six soldiers were billeted on Madame Vintroux when she received the direction to pack up her husband's goods. His clerk, who was used to packing goods, with the assistance of a servant or porter, packed them up in the cellar in the best way they could, and made out the accompanying papers in great agitation, hurry, and confusion. This was done in the night while the Prussians were asleep. The clerk made out the invoices after the packing was all finished, from the memorandums made at the time. The servant called off the ticket attached to each piece, and the clerk took it down. The goods were sent from Caen in the day time in the diligence and a private wagon. Madame Vintroux and the clerk went with the goods to Havre, and shipped the greater part of them before the arrival of the claimant.

The claimant's clerk in making the invoice of the twelve cases of clocks, which stood in the cellar, supposed that each case contained a clock, and made the invoice out accordingly. This invoice corresponded with the invoices of the consignment of the twelve clocks sent to Madame Vintroux by John Louis Vintroux. A large box containing shawls, which the clerk had already packed, but had forgotten it, was standing among them, and he supposed it contained the other six clocks. This he put in the invoice as containing six clocks, and charged the prices the same as in the invoice (of the other six) sent from Paris. The linens were purchased in August by the claimant at the fair of Guybray, of M. Despierre of Alençon the manufacturer. He testified that in consequence of the precipitation with which the linens were put up at Alençon, owing to their fear that the place would be pillaged, all the mistakes made in the entry at New York were made in invoicing the goods before they were sent from Alençon to Caen. On discovering the errors, he claimed the difference of Madame Vintroux, who desired him to wait until she could hear from her husband in New York, as she had not ascertained the contents of the packages of linen before they were shipped. This testimony corroborated, and was corroborated by a letter written by Madame Vintroux to her husband, informing him of this mistake, and produced on the trial.

Twenty-five merchants of Caen, and the chamber of commerce of that city, as well as numerous other witnesses, examined in the cause, bore testimony to the high character of the claimant as a merchant. Each of the most material facts above stated was proved by several witnesses who were uncontradicted. Claimant went from Paris to Havre where he met his wife, and found part of his goods already shipped. The rest were shipped with difficulty and in confusion, owing to the great press to ship goods in the vessel. While at Havre, claimant suddenly resolved to come out with his goods.

After his arrival in New York, where he was examining some of the packages at his room, assisted by two clerks, and in the presence sometimes of other persons, he first discovered the errors in the quantities. He at first complained of these, and then declared that he would go and inform the officers of the customs. His clerk told him to wait and see if there was any excess. The box of shawls which was invoiced as containing six clocks, was opened in the presence of several persons, and claimant expressed his surprise at the mistake. They had only opened six packages when the seizure was made. The dry goods, including the linens, were found packed in some instances, two pieces in one bundle, and this was the way in which they overrun the invoice. The ticket on one or the other piece in the bundle generally corresponded with the invoice, as did the number of bundles in the packages. Two of the examiners testified that it was not unusual to find silks, crapes, &c., packed two pieces in a bundle, but they had never known the same thing occur in opening linens. They said that a bundle of the goods which they examined, composed of two pieces, might be easily mistaken by a porter for one piece. Two other of the examiners testified that the packages were so large that any one accustomed to the kind of goods could tell by looking at the outside, that they contained more than the invoice quantity of pieces. They also stated that the goods were very well packed.

J. Fisk, U. S. Dist. Atty., and C. Baldwin, for the United States.

T. A. Emmet and C. Graham, for claimant.

LIVINGSTON, Circuit Justice. The goods, mentioned in this libel, were proceeded against in the district court for the Southern district of New York, as forfeited under the sixty-seventh section of the collection law (3 Bior. & D. Laws, 199 [1 Stat. 677]), because, as was alleged, the packages containing them differed in their contents from the entry

which had been made of them at the custom-house. The property was claimed by William Vintroux Hersan, for himself, and John Louis Vintroux, of Paris; that is to say, all the merchandise libelled, was stated to belong to the former, except the twelve cases of clocks, which were said to belong bona fide to the latter. The claim, without in terms denying that the contents of the packages differed from the entry of them, insists, that if such difference existed, it proceeded from accident or mistake, and not from an intention to defraud the revenue— and alleges, that the cases were packed up at Caen, in France, while that place was in possession of the Prussian troops, and after it had been threatened to be pillaged by them, which circumstance occasioned the goods to be packed in great haste and confusion, and may have caused a difference between the invoice and the actual contents of the packages. After a hearing in the district court, the clocks and linens mentioned in the libel were condemned, and all the other articles acquitted. The United States and the claimants have both appealed.

This is a case not without its difficulties, and has been argued with an ability due to its importance and intricacy. There is no doubt that the allegations in the libel are substantially made out, and that there were many, and in some instances considerable variations between the actual contents of the packages, and their contents as exhibited by the entry at the custom-house. If the court, therefore, were not permitted to look beyond that fact, it would be difficult for any of the articles libelled to escape confiscation. But the law, under which these proceedings have been instituted, supposes that such differences will sometimes intervene by accident or mistake; and if that can be made out to the satisfaction of the court, in which the prosecution is depending, a forfeiture shall not attach.

The court will now proceed to examine how far the claimant has established his innocence. If he has designedly attempted to impose on the officers of the customs, he must submit to the consequences, penal and calamitous as they may be; but if he has succeeded in establishing any facts, which may reasonably account for the differences complained of, it will be the duty of the court, and must always be a pleasant one, to restore to him his property. That part of the case which relates to the linens will be first disposed of.

It has been said in argument, that probable cause having been shown for the seizure, a very clear case must be made out by the claimant, to entitle him to a restoration of the property; and the court has been cautioned not to place too much reliance on positive and direct testimony, if it shall appear to be in conflict with the many and strong presumptive circumstances which appear in the case. Notwithstanding the fact is made out on which the seizure proceeded, and which unexplained would have been followed by forfeiture, all the claimant has to do, is to prove the mistake on which he relies, in the ordinary way, and the court is not authorized to call upon him to present a clearer case, than it would have a right to require in the investigation of any other matter of fact. It is no less melancholy than true, that a court is sometimes compelled, however reluctantly, to reject the most positive declarations of witnesses, although delivered under the high and sacred sanctions of an oath, when opposed to presumptive circumstances, which it is not easy to reconcile with such testimony. A court will not, however, easily suspect the truth of such declarations, when corroborated by many witnesses, who have a fair character, and who have no interest in the matter in controversy; but rather than reject, will do all in its power to reconcile them with such circumstances; and if that cannot be done, the latter must be numerous and of the most controlling and irresistible nature to justify an entire disregard of the positive testimony.

With respect to the linens, there are no circumstances to induce the court to believe, that the mistake in this article may not have been accidental, and altogether unknown to the claimant, until after their examination in this country. These linens appear by the testimony of Mr. Despierres, jun. a merchant of Alençon, (which has been taken under a commission since the cause came from the district court,) to have been purchased of him at a fair at Guibray for the claimant, for the sum of seven thousand four hundred and fifteen francs and ninety-two centimes, which is the price at which they were invoiced, and on which duties were calculated at the custom-house. This witness, in addition to the very important fact which he establishes of their being invoiced at the price of their actual cost, also proves that shortly after the sale, and as soon as they had recovered at Alençon from the fear of being pillaged by the foreign troops, he discovered errors against himself in the sale of the linens, of which he immediately apprized Madame Vintroux and claimed from her the difference. That lady begged his forbearance, in order to refer the matter to her husband, to whom the linens had been sent without examination of them. These mistakes proceeded, as the same witness informs us, from the precipitation under which they were packed, to withdraw them from the pillage, from which Alençon narrowly escaped, having already experienced all the horrors of war. Relying on the probity of Mr. Vintroux, with whom he had had dealings before, Mr. Despierres consented to the delay.

That this story is no fabrication of recent date, to answer the purposes of the claim-

ant, appears by a letter written by Madame Vintroux at Caen to her husband. on the 15th of October. 1815, very shortly after his leaving France, and which it is proved, by witnesses on the spot, was received by him not many days after his arrival in this country, in which letter the reclamation of Mr. Despierres is distinctly stated, and Mr. Vintroux is requested to take proper measures to ascertain the extent of the error that had taken place. On this testimony, although it does not appear what excess was claimed on the linens, yet as there is no contradictory evidence on this point deserving of any attention, the court feels itself bound to order a restoration of the linens to the claimant. It is proved positively, that the linens cost no more than the sum at which they were invoiced, and of course, unless the mistake committed at the fair of Guibray, was known to Mr. Vintroux, at the time of the entry of them, which is not proved, his conduct as far as concerns this article is free from every imputation.

The allegation against the clocks will be next examined. It is, that the twelve packages of clocks, marked and numbered W. No. 1, on to W. No. 12 inclusive, were found to differ in their contents from the entry, in this; that these packages were entered, as containing twelve clocks, and that the same contained nineteen. Another box containing six clocks and marked V. H. No. 1, was entered at the same time, so that in all eighteen clocks only were entered, and duties paid on them. On examination, however, it was found, that the whole number of clocks entered were found in the cases marked W. No. 1 to 12. Hence suspicions were excited (V. H. No. 1 having also been entered as containing six clocks,) that twenty-four clocks had been imported by the claimant instead of eighteen. If the actual importation of that number had been proved the libellant would have made out a clear case, so far as relates to this article; but although attempts were made to establish that fact, they were quite unsuccessful; and notwithstanding the pains which were taken with that view, there is no evidence in the cause, that any one of the persons, who were about the claimant after his arrival in this country, some of whom assisted in examining his goods, ever saw any of the six clocks, which it is supposed were fraudulently subtracted from an entry. Nor has any person, who deals in this article in this city, been found, who can fix on the claimant, or any agent of his, the sale of more clocks than were entered, although two witnesses, who were dealers in clocks, were examined with that intent. If the allegation, therefore, in the libel be true, that in the twelve cases were more clocks than they were entered as containing; yet if it shall appear that no clocks were contained in any other case, which was entered as containing

six, no fraud has been committed on the revenue, nor could any have been intended, and of course no forfeiture has been incurred. The claimant, not relying on the absence of all positive proof, on this point, has endeavoured to satisfy the court, that all the clocks imported by him in the Ann Williams were regularly entered; and that, although in the cases which were supposed to contain only a dozen, eighteen or nineteen were found, not a single clock was discovered in any other package.

The court is greatly mistaken if the claimant's proof on this part of his case, will not be found very satisfactory. There is no doubt, that the eighteen clocks were an adventure, belonging, not to the claimant, but to his father at Paris, by whom they were sent to Madame Vintroux at Caen to be forwarded to the United States. The first we hear of them is in a letter written by the elder Mr. Vintroux to the wife of the claimant. Mr. Bellair, who put up the goods belonging to claimant, declares that he packed no clocks for him; and knows of none, except those in the box marked V. V. or W. No. 1 to 12—and a wooden clock, and two which were entered on the invoice made by him as contained in the package marked V. H. No. 22. This witness also informs us how it happened, that each of the boxes from No. 1 to 12 were entered as containing each one clock, and another box as containing six. After he had packed the goods of the claimant, Madame Vintroux gave him the bill of parcels of the clocks, which came from Paris  By this he found there were eighteen clocks, and supposed that the cases marked from one to twelve contained only one clock each. The other six, therefore, he supposed were contained in a large case which was among the others, and although this case was one, which he had packed himself, yet not adverting to that circumstance at the time, he marked it V. H. No. 1; and entered it in the invoice. under that mark, as containing clocks.

This corresponds with the information which the claimant gave to another witness on his passage to this country, that he had only eighteen clocks which belonged to his father, which declaration. although it comes from a person now interested, is entitled to some attention, considering the time and circumstances under which it was made. This same witness, Mr. Collet, was also present when a box was opened. which the claimant expected to contain clocks, but in it were only Angora shawls or gloves. This box, he says. was opened in the street, because, as he supposes, the entry of the house, before which it stood, was too small to admit of its being taken up stairs. Mr. Demolliens proves the same thing, although he is somewhat more particular in his relation. and unless we believe him guilty of wilful perjury. we must be satisfied that the

case marked No. 1, V. H., notwithstanding the invoice, did not contain a single clock. He was directed by Mrs. Vintroux, in order that the watchmakers might examine the clocks, to bring it to his chamber, where it was found, on examination, to contain articles which were invoiced as being in another package. Mr. Scheffelin also proves that two large cases were opened which contained Angora shawls, gloves, &c. Mr. Bouchaud, whom all parties appear willing to believe, declares that he never saw any clocks in the possession of the claimant, except those which came from the public store. Considering how much Mr. Bouchaud had to do with this cargo, and how frequently he must have been with the claimant, after his arrival, this circumstance is entitled to very great consideration. It seems impossible that these clocks, which are now supposed to have been disposed of, should not have been seen by this gentleman before they were sold. Yet neither he, nor any other person about the claimant, ever saw them.

But without pursuing this subject farther, the court is satisfied, that this part of the libellant's case is not made out, unless no explanation can be received to establish the innocence of a transaction, which unaccounted for, must have drawn after it all the consequences of a confiscation. But this explanation, in the opinion of the court, has been given, and can only be got rid of by opposing to it some circumstances, which although sufficient to raise doubts, ought not to be permitted to outweigh so much of positive testimony, with which this part of the claimant's case abounds. If the court does not stop to notice these circumstances, it is not because they have not been attended to, but because it is of opinion, after full consideration, that all of them together will not justify a sentence of condemnation. The clocks therefore must also be restored.

The case of the other articles libelled will now be considered. The circumstances attending them are so much alike, that they must all be liable to the same judgment. The excuse, which applies particularly to this portion of the importation, is, that it was packed up at Caen in the absence of the proprietor, and in such haste and confusion, in consequence of apprehensions entertained at that place of the Prussian troops, that all the mistakes and inaccuracies which have been discovered are attributable to those causes, and did not proceed from any intentional fraud on the part of the owner. This defence has been treated with great levity by the counsel for the United States, and attempts were made to induce the court to believe that the testimony, which appears in support of it, has all been fabricated, to suit the purposes of the claimant. But such a body of evidence, whatever suspicions may be entertained by those who have an interest in disbelieving every part of it, must have its influence on a

court, so long as it is mindful of its duty, and does not think itself absolved from every obligation to decide according to the proofs before it. Both of the persons, who packed these goods, Mr. Bellair, a clerk of the claimant, and Joseph Boissellier, a resident of the city of Caen, prove that the packing took place at night in a cellar of the claimant. That this was done in much haste and confusion, from an apprehension of being discovered by the Prussians, some of whom were quartered in the house of Mr. Vintroux. The packages were sometimes marked the same night, and sometimes not until the next day, which may account why the contents of some of them were marked as being in another.

It was doubted on the argument, whether this apprehension of the Prussians, was well founded, and much was said of the tranquillity of France after the return of Louis XVIII., which was effected by the battle of Waterloo. But whatever might have been the condition of other parts of that kingdom, more than twelve witnesses have been examined, most of them residents of Caen, who describe the conduct of the military, who occupied that place, during the fall of the year 1815, as well calculated to excite the fears of the inhabitants about the safety of their property. So great and general was this apprehension, that many buried their valuable effects to place them beyond the reach of the soldiery. It would appear indeed, that previous to Madame Vintroux's receiving directions from her husband, who was then in Paris, to pack up his goods at Caen, to be sent to America, she had determined to have it done merely to send them to some place of greater safety. But it was not only at Caen that excesses were committed by the army of occupation; for it appears, from the examination of Mr. Despierres, a merchant who resides at Alençon, that the inhabitants of that place were also under apprehensions of a military pillage.

There is nothing to detract from the credit due to such a mass of corresponding testimony, but the solitary declaration of one witness who was but two days at Caen, and saw no obstructions to business, the shops being open as usual. Now this may very well be, and yet none of the material facts, on which the claimant relies, are disproved by it. The town may have been very quiet the two days which this witness passed on his party of pleasure at Caen; and yet the soldiers may have behaved very much amiss both before and after; and the alarms and fears, which are spoken of may well have been very general at that place. The troops there were very numerous, and had already committed many outrages. When they might proceed to others still greater, no one could say. Nor is it any thing against the truth of this representation, that these goods were publicly removed from Caen, and in the day-time. Property in that situation would not be so liable to pillage in a place where any discipline at all was observed, as if it were concealed from

public view, but in places to which the troops might easily have access, and that at a time when their officers, or those who might feel disposed to check them, were asleep.

The absence of Mr. Vintroux at Paris, while these goods were packing, and his going direct from that city to Havre, without his ever having been at Caen, since his leaving it in the latter end of August, 1815, is as well, if not more certainly established, as that part of his defence which arises out of the irregularities and violences of the Prussian army. Nor was this an unimportant fact to make out, for it will readily be conceded that more indulgence is due to a merchant whose goods are packed in his absence, than if he had been on the spot to attend to the business himself. The letter signed by him, and annexed to the invoice, although dated at Caen, is proved to have received his signature at Havre, having been previously written at Caen by Mr. Bellair, under the direction of Madame Vintroux, who appears herself to have been a merchant. The regular name in which the invoice is made out, has also been urged as an argument against the haste under which it is alleged, that these packages were made up. This is accounted for by Mr. Bellair, whose relation is no way improbable. The invoice was made by him, at his leisure, from the memoranda preserved at the time of packing, and he supposed, and so informed Mr. Vintroux, that it was correct.

The sudden resolution of the claimant to come to this country is also treated as a mere pretence. It is not improbable that such intention was first conceived at Havre; but the court does not think it worth while to employ any time in ascertaining the truth of this representation, feeling, as it does, a repugnance which it is not desirous of overcoming, at condemning a valuable property on a doubtful circumstance, which has not a very important or direct bearing on the immediate point in controversy. With the same remark it might dismiss all consideration of the very great surprise which has been expressed at this property's being consigned to Mr. Bouchaud, and being entered by him, after the owner had determined to accompany it, and actually did arrive with it in this city. If it be true, as the court believes, that this property was put up in the absence of Mr. Vintroux, and the invoice made out by his clerk, it is not easy to conjecture any improper motive for applying to Mr. Bouchaud to make the entry. Mr. Vintroux could very conscientiously have taken the usual oath. A motive, and a fair one therefore, may be assigned for this part of his conduct. This gentleman, being a stranger, might well employ Mr. Bouchaud, who was on the spot, and better acquainted with the manner of doing business at our custom-house. He might also have found it necessary, in order to obtain security for the duties, to place them in the hands of Mr. Bouchaud, who might then as well make the entry also.

It has likewise been imputed, as something more than an oversight, to Mr. Vintroux, that he omitted to apprize the collector of the mistakes, as soon as they were discovered. If the examination had been finished before the seizure, and his silence had then continued, there might have been some ground for this imputation; but a seizure took place so soon as to render impossible any communication, that would have been satisfactory; for, that the claimant contemplated informing the collector of the errors which might be discovered, as soon as the examination was closed, there is some ground to believe, from part of the testimony in the cause. It may be, that the apprehension of a seizure deterred Mr. Vintroux from a disclosure. Such neglect would have been improper, and would have exposed him to very just suspicion. And yet, during the present term, a sentence of restitution has proceeded on the very ground, that a prosecution took place in consequence of such information having been given to the custom-house, and in good faith, by the importer himself.

It is but just here, to remark, that the conduct of Mr. Vintroux, after he was apprized of a determination to seize, was ingenuous and very different from what would be looked for, in a person who had, from the beginning, laid a plan to defraud the government. Instead of concealing any part of the property, which might easily have been done, the whole of it being under his control, we find him pointing out where it was, and affording every facility in his power to the officers of the customs. This may not be an improper place to remark on the character of the claimant, which, in a proceeding of this nature, is not to be entirely disregarded. All the witnesses, who have had occasion to speak of it, represent him as a gentleman of probity and property, and very highly respected in his own country, and consider him incapable of meditating a fraud of this, or any other kind. It is indeed difficult to persuade oneself that a man of good standing, and fair character in his own country, and of large property, should commence his career in a country, of which he intended to become a member, with a fraud, so easy of detection, from which indeed a miserable saving might have resulted, but not without great hazard, not only of losing a large portion of his fortune, but of fixing on his reputation a stain, which no time could wash away: for it must be remembered that a fraud of this nature cannot be practised, without wilful perjury in the party himself, or, (which would be almost as culpable,) without his procuring or permitting another to swear to what he himself knew to be a falsehood. There was no adequate motive for so deep and unequal a game, nor is it to be reconciled with the former habits and character of the claimant; which, as has just been mentioned, are proved to have been honourable and upright.

The court considers it evincive of the good

faith and integrity of the claimant, that, in order to explain this transaction, he has taken so much pains, and gone to such an expense in examining so many witnesses in a foreign country, and that too in his absence, which he would hardly have done, but under a consciousness that they could testify to the truth of the circumstances, on which he relied as proofs of his innocence. But admitting the correctness of Mr. Bellair's relation and of the other witnesses, it was insisted that his gross negligence, as it was termed, either in the packing of the goods, or in not informing Mr. Vintroux of the manner in which it was done, must be regarded as a fraud in his principal, under whose instructions, the presumption is, that he acted as he did. The court is at a loss, how such an inference is to be made consistent with the testimony of this gentleman, who discloses no such instruction, and declares that the goods were packed as well as could be done, under existing circumstances, and that nothing was said on the subject to Mr. Vintroux, because, notwithstanding the precipitation which attended the putting up of the goods, he believed the invoice would be found correct.

The veracity of this witness has also been called in question, on a supposition that he must be incorrect in the cause which he assigns for Madame de Vintroux's not accompanying her husband to the United States. This is considered as an invention of his own, as that lady was not confined until several months after the Ann Williams left Havre. Now it so happens that Mary Botte, who resided in the family of the claimant at Caen, proves the same fact; and there is no doubt at all, that although there was no immediate expectation of his wife's confinement when the claimant left Havre, yet her situation must have been such as is described by Mr. Bellair, and as might well have deterred her from undertaking a voyage to this country. Nor is it quite correct, as was asserted on the hearing, that all the differences which were discovered between the invoice and the actual contents of the packages, were uniformly in favour of the claimant: for some of the packages were correct, and others contained less in quantity than was represented on the entry. Some packages, therefore, were not seized, and others which had been seized, were returned.

Upon the whole, it is the opinion of this court, that whatever differences existed in this case between the entries at the custom-house, and the real contents of the packages, the claimant has succeeded in exculpating himself from all intention of fraud; and that therefore the sentence of the district court must be affirmed so far as it acquitted any part of the property libelled, or adjudged that there was probable cause of seizure, and ordered the claimant to pay the costs of that court; and reversed as to the residue of said decree. Each party must pay his own costs on the appeal.