*PRELIMINARY PRINT*

VOLUME 601 U. S. PART 2

PAGES 377–415

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MAY 9, 2024

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## CULLEY et al. *v.* MARSHALL, ATTORNEY GENERAL OF ALABAMA, et al.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 22–585.   Argued October 30, 2023—Decided May 9, 2024

Petitioner Halima Culley loaned her car to her son, who was later pulled over by Alabama police officers and arrested for possession of marijuana.   Petitioner Lena Sutton loaned her car to a friend, who was stopped by Alabama police and arrested for trafficking methamphetamine.   In both cases, petitioners' cars were seized under an Alabama civil forfeiture law that permitted seizure of a car "incident to an arrest" so long as the State then "promptly" initiated a forfeiture case.   Ala. Code § 20–2–93(b)(1), (c).   The State of Alabama filed forfeiture complaints against Culley's and Sutton's cars just 10 and 13 days, respectively, after their seizure.   While their forfeiture proceedings were pending, Culley and Sutton each filed purported class-action complaints in federal court seeking money damages under 42 U. S. C. § 1983, claiming that state officials violated their due process rights by retaining their cars during the forfeiture process without holding preliminary hearings.   In a consolidated appeal, the Eleventh Circuit affirmed the dismissal of petitioners' claims, holding that a timely forfeiture hearing affords claimants due process and that no separate preliminary hearing is constitutionally required.

*Held*: In civil forfeiture cases involving personal property, the Due Process Clause requires a timely forfeiture hearing but does not require a separate preliminary hearing.   Pp. 384–393.

   (a) Due process ordinarily requires States to provide notice and a hearing before seizing real property.   But States may immediately seize personal property subject to civil forfeiture when the property (for example, a car) otherwise could be removed, destroyed, or concealed before a forfeiture hearing.   When a State seizes personal property, due process requires a *timely* post-seizure forfeiture hearing.   See *United States* v. *Von Neumann*, 474 U. S. 242, 249–250; *United States* v. *$8,850*, 461 U. S. 555, 562–565.

   The Court's decisions in *$8,850* and *Von Neumann* make crystal clear that due process does not require a separate preliminary hearing to determine whether seized personal property may be retained pending the ultimate forfeiture hearing.   In *$8,850*, the Court addressed the process due when the Customs Service seized currency from an individ-

ual entering the United States but did not immediately file for civil forfeiture of the currency. The Court concluded that a post-seizure delay "may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time," 461 U. S., at 562–563, and prescribed factors for courts to consider in assessing whether a forfeiture hearing is timely. *Id.*, at 564–565. In *Von Neumann*, a property owner failed to declare the purchase of his new car upon driving it into the United States, and a customs official seized the car after determining that it was subject to civil forfeiture. The plaintiff filed a petition for remission of the forfeiture—in essence, a request under federal law that the Government exercise its discretion to forgive the forfeiture—which the Government did not answer for 36 days. The plaintiff sued, arguing that the Government's delay in answering the remission petition violated due process. The Court rejected that claim, broadly holding that due process did not require a pre-forfeiture-hearing remission procedure in the first place. See 474 U. S., at 249–250. Instead, *Von Neumann* held that a timely forfeiture hearing satisfies due process in civil forfeiture cases, and that *$8,850* specifies the standard for when a forfeiture hearing is timely.

Petitioners' argument for a separate preliminary hearing appears to be a backdoor argument for a more timely forfeiture hearing to allow a property owner with a good defense to recover her property quickly. But the Court's precedents already require a timely hearing, and a property owner can raise *$8,850*-based arguments to ensure a timely hearing. Petitioners' efforts to distinguish *Von Neumann* on the ground that the statutory remission procedure in that case was discretionary fail because that fact played no role in the Court's constitutional analysis. Petitioners also cannot distinguish the relevant language in *Von Neumann* as dicta, as the Court ruled for the Government on the ground that a timely "forfeiture proceeding, without more, provides the postseizure hearing required by due process" in civil forfeiture cases. 474 U. S., at 249. Similarly, petitioners' contention that *Mathews* v. *Eldridge*, 424 U. S. 319, should govern petitioners' request for a preliminary hearing fails given that this Court decided *$8,850* and *Von Neumann* after *Mathews*.

In addition, petitioners point to the Court's Fourth Amendment decisions in the criminal context to support their contention that a preliminary hearing is required in the civil forfeiture context. That analogy fails. Fourth Amendment hearings are not adversarial, and address only whether probable cause supports the arrestee's detention. See *Gerstein* v. *Pugh*, 420 U. S. 103, 119–122. Here, petitioners argue that

the immediate seizure of personal property requires adversarial preliminary hearings, and they assert that those hearings must address their affirmative defense of innocent ownership. But the Due Process Clause does not require more extensive preliminary procedures for the temporary retention of property than for the temporary restraint of persons. Pp. 384–390.

(b) Historical practice reinforces the Court's conclusions in *$8,850* and *Von Neumann* that due process does not require preliminary hearings in civil forfeiture cases. Since the Founding era, many federal and state statutes have authorized the Government to seize personal property and hold it pending a forfeiture hearing, without a separate preliminary hearing. Petitioners and their *amici* do not identify any federal or state statutes that, before the late 20th century, required preliminary hearings in civil forfeiture cases. Some States have recently enacted laws requiring preliminary hearings in civil forfeiture cases, but those recent laws do not support a constitutional mandate for preliminary hearings in every State. History demonstrates that both Congress and the States have long authorized law enforcement to seize personal property and hold it until a forfeiture hearing. The absence of separate preliminary hearings in civil forfeiture proceedings—from the Founding until the late 20th century—is weighty evidence that due process does not require such hearings. Pp. 390–392.

Affirmed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and BARRETT, JJ., joined. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 393. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined, *post*, p. 403.

*Shay Dvoretzky* argued the cause for petitioners. With him on the briefs were *Parker Rider-Longmaid, Kyser Blakely, Jeremy Patashnik*, and *Brian M. Clark*.

*Edmund G. LaCour, Jr.*, Solicitor General of Alabama, argued the cause for respondents. With him on the brief were *Steve Marshall*, Attorney General, *pro se, Robert M. Overing*, Deputy Solicitor General, *Brad A. Chynoweth*, Assistant Chief Deputy Attorney General, and *Brenton M. Smith*, Assistant Attorney General. *Ed R. Haden, Michael P. Taunton, Thomas O. Gaillard, III, William W. Watts, III*, and

*H. Edgar Howard* filed a brief for respondents City of Satsuma, Alabama, et al.

*Nicole Frazer Reaves* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Prelogar, Acting Assistant Attorney General Argentieri, Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Feigin, Ann O'Connell Adams,* and *Sarah Carroll.**

JUSTICE KAVANAUGH delivered the opinion of the Court.

When police seize and then seek civil forfeiture of a car that was used to commit a drug offense, the Constitution requires a timely forfeiture hearing. The question here is whether the Constitution also requires a separate preliminary hearing to determine whether the police may retain the

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Abram J. Pafford, John W. Whitehead, David D. Cole,* and *Jay R. Schweikert*; for the Buckeye Institute by *Jay R. Carson* and *David C. Tryon*; for the Constitutional Accountability Center by *Elizabeth B. Wydra, Brianne J. Gorod,* and *Brian R. Frazelle*; for the Goldwater Institute et al. by *Timothy Sandefur, Deborah J. La Fetra,* and *Ilya Shapiro*; for the Institute for Justice et al. by *Robert Johnson*; and for the Legal Aid Society by *Thomas M. O'Brien, Corey Stoughton,* and *Philip Desgranges.*

Briefs of *amici curiae* urging affirmance were filed for the State of Georgia et al. by *Christopher M. Carr,* Attorney General of Georgia, and *Stephen J. Petrany,* Solicitor General, and by the Attorneys General for their respective States as follows: *Treg Taylor* of Alaska, *Tim Griffin* of Arkansas, *Raúl Labrador* of Idaho, *Lynn Fitch* of Mississippi, *Austin Knudsen* of Montana, *Michael T. Hilgers* of Nebraska, *John M. Formella* of New Hampshire, *Gentner Drummond* of Oklahoma, *Michelle A. Henry* of Pennsylvania, *Alan Wilson* of South Carolina, *Marty Jackley* of South Dakota, and *Jonathan Skrmetti* of Tennessee; for Wayne County, Michigan, by *Davidde A. Stella*; and for the International Municipal Lawyers Association et al. by *Gilbert C. Dickey.*

Briefs of *amici curiae* were filed for the National Federation of Independent Business Small Business Legal Center, Inc., by *Elizabeth Gaudio Milito*; and for Restore the Fourth, Inc., by *Mahesha P. Subbaraman.*

car pending the forfeiture hearing. This Court's precedents establish that the answer is no: The Constitution requires a timely forfeiture hearing; the Constitution does not also require a separate preliminary hearing.

I

Halima Culley loaned her car to her college-aged son. On February 17, 2019, police officers in Satsuma, Alabama, stopped the car while the son was driving, and the officers discovered marijuana and a loaded handgun in the car. The officers arrested Culley's son and charged him with possessing marijuana. The officers also seized the car incident to the arrest.

At about the same time in 2019, Lena Sutton loaned her car to a friend. On February 21, 2019, police officers in Leesburg, Alabama, stopped the car while Sutton's friend was driving, and the officers discovered a large amount of methamphetamine in the car. The officers arrested Sutton's friend and charged him with trafficking methamphetamine and possessing drug paraphernalia. The officers also seized the car incident to the arrest.

At the time of the seizures of the two cars, Alabama law authorized the civil forfeiture of a car used to commit or facilitate a drug crime. See Ala. Code § 20–2–93(a)(5) (2015). Officers could seize the car "incident to an arrest" so long as the State then "promptly" initiated a forfeiture case. § 20–2–93(b)(1), (c). In the interim before the forfeiture hearing, the car's owner could recover it by posting bond at double the car's value. See § 20–2–93(h); § 28–4–287 (2013). At the forfeiture hearing, the owner could prevail and recover the car under Alabama's "affirmative defense" for "innocent owners of property subject to forfeiture." *Wallace* v. *State*, 229 So. 3d 1108, 1110 (Ala. Civ. App. 2017). That defense required the owner to show that the owner lacked knowledge of the car's connection to the drug crime. See Ala. Code § 20–2–93(h) (2015).

The State of Alabama filed a forfeiture complaint against Culley's car on February 27, 2019, just 10 days after the seizure of the car. But Culley waited six months before answering that complaint. And she waited another year—until September 21, 2020—before raising an innocent owner defense in a motion for summary judgment. Soon thereafter, on October 30, 2020, an Alabama state court granted Culley's motion and ordered the return of her car.

Sutton similarly moved slowly in her forfeiture proceeding. Alabama brought a forfeiture case against Sutton's car on March 6, 2019, just 13 days after the seizure of the car. Sutton initially failed to appear in the case, causing the state court to enter a default judgment for Alabama. Sutton later requested that the state court set aside that judgment, and the state court did so. Sutton then submitted a brief answer and served discovery requests on Alabama, but Sutton otherwise took no action until the state court set a date for the forfeiture trial. On April 10, 2020, three weeks before the scheduled trial date, Sutton finally moved for summary judgment on the ground that she was an innocent owner. Soon thereafter, on May 28, 2020, the state court granted her motion, and she recovered her car.

While those forfeiture cases were ongoing, Culley and Sutton filed purported class-action complaints in federal court. Culley sued in the U. S. District Court for the Southern District of Alabama. Sutton sued in the U. S. District Court for the Northern District of Alabama. Both sought money damages under 42 U. S. C. § 1983, claiming that the state officials violated their due process rights by retaining their cars during the forfeiture process without holding preliminary hearings. Culley and Sutton argued that a preliminary hearing (also referred to as a retention hearing) is required under the *Mathews* v. *Eldridge* due process test, which balances the private interests at stake, the value of added procedures, and the burdens on the government from the added procedures. See 424 U. S. 319, 334–335 (1976).

Opinion of the Court

The District Court for the Southern District of Alabama dismissed Culley's complaint. *Culley* v. *Marshall*, Civ. Action No. 19–701 (Sept. 29, 2021), App. to Pet. for Cert. 58a. Relying on this Court's decisions in *United States* v. *$8,850*, 461 U. S. 555 (1983), and *United States* v. *Von Neumann*, 474 U. S. 242 (1986), the District Court held that due process requires a timely forfeiture hearing but not a separate preliminary hearing. See App. to Pet. for Cert. 44a–46a. The District Court then assessed the timeliness of Culley's forfeiture hearing under the four-factor test set forth in *$8,850*, which looks to (i) the length of the delay of the forfeiture hearing, (ii) the reason for the delay, (iii) whether the claimant requested a timely hearing, and (iv) whether the delay was prejudicial. See *id.*, at 46a–47a (citing *$8,850*, 461 U. S., at 563–565). The District Court concluded that Culley's forfeiture hearing was timely under those factors because she played a "significant role" in delaying her own case. App. to Pet. for Cert. 47a.

The District Court for the Northern District of Alabama similarly entered summary judgment against Sutton on her due process claim. *Sutton* v. *Leesburg*, Civ. Action No. 20–91 (Sept. 13, 2021), App. to Pet. for Cert. 71a. The District Court determined that Sutton's claim depended on whether she received a timely forfeiture hearing within the meaning of *$8,850*. See *id.*, at 66a–70a. The District Court ruled that Sutton's forfeiture hearing was timely and satisfied due process, in part because Sutton never asked for an earlier hearing. See *id.*, at 70a–71a.

The U. S. Court of Appeals for the Eleventh Circuit consolidated the two cases and affirmed. *Culley* v. *Attorney General*, No. 21–13805 etc. (July 11, 2022), App. to Pet. for Cert. 1a–2a. The Court of Appeals agreed with the two district courts that a timely forfeiture hearing affords claimants due process and that no separate preliminary hearing is constitutionally required. See *id.*, at 6a–8a. The Court of Appeals rested its conclusion on circuit precedent, which in turn re-

lied on this Court's decisions in *$8,850* and *Von Neumann*.
See *ibid.*

Because of a conflict in the Courts of Appeals over
whether the Constitution requires a preliminary hearing in
civil forfeiture cases, this Court granted certiorari. See 598
U. S. 1243 (2023). Compare App. to Pet. for Cert. 6a–8a
with *Ingram* v. *Wayne County*, 81 F. 4th 603, 620 (CA6 2023);
*Krimstock* v. *Kelly*, 306 F. 3d 40, 44 (CA2 2002).[1]

## II

Under the Due Process Clause of the Fourteenth Amend-
ment as interpreted by this Court, States ordinarily may not
seize real property before providing notice and a hearing.
See *United States* v. *James Daniel Good Real Property*, 510
U. S. 43, 62 (1993). But States may immediately seize per-
sonal property (for example, a car) that is subject to civil
forfeiture when the property otherwise could be removed,
destroyed, or concealed before a forfeiture hearing. See
*Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663,
679–680 (1974).

When States seize and seek civil forfeiture of personal
property, due process requires a *timely* post-seizure forfeit-
ure hearing. See *United States* v. *Von Neumann*, 474 U. S.
242, 247–250 (1986); *United States* v. *$8,850*, 461 U. S. 555,
562–565 (1983). In this case, petitioners Culley and Sutton
do not challenge the timeliness of their forfeiture hearings.
Rather, they argue that the Due Process Clause requires

———————
[1] Before the entry of judgment by the Court of Appeals, Alabama
amended its forfeiture laws to allow an innocent owner to request an "ex-
pedited hearing" "at any time after seizure of property and before entry
of a conviction" in a "related criminal case." Ala. Code § 15–5–63(3)
(2018); § 20–2–93(*l*) (Cum. Supp. 2023); see also Ala. Act 2021–497 (effective
Jan. 1, 2022). That amendment did not moot this case because Culley's
and Sutton's requested relief includes money damages against the munici-
palities of Satsuma and Leesburg. See *Culley* v. *Attorney General*, No.
21–13805 etc., App. to Pet. for Cert. 6a.

Opinion of the Court

States to also hold a separate preliminary hearing before the forfeiture hearing.

A

Culley and Sutton argue that a preliminary hearing is constitutionally necessary to determine whether States may retain seized personal property pending the ultimate forfeiture hearing. As petitioners envision it, the preliminary hearing would focus on the "'probable validity'" of the forfeiture. *Krimstock* v. *Kelly,* 306 F. 3d 40, 48 (CA2 2002) (quoting *Commissioner* v. *Shapiro,* 424 U. S. 614, 629 (1976)). The preliminary hearing would be adversarial, the parties could introduce evidence and cross-examine witnesses, and property owners could raise affirmative defenses, including innocent ownership. In essence, the preliminary hearing would be an earlier version of the forfeiture hearing itself.

Alabama and its *amici,* including the United States, disagree. They argue that a preliminary hearing is not constitutionally required. To begin, they emphasize that most States and the Federal Government do not currently provide preliminary hearings in civil forfeiture cases. So requiring a preliminary hearing as a matter of constitutional dictate would necessitate a major change in the States' and the Federal Government's longstanding practices. Alabama and its *amici* also contend that a property owner's post-seizure rights are already protected by the constitutional requirement that the forfeiture hearing be timely. They further assert that requiring a "hearing before a hearing" in every case, as petitioners want, would interfere with important law-enforcement activities that must occur after the seizure and before the forfeiture hearing—including identifying and contacting potential claimants of the property; coordinating forfeiture proceedings with related criminal investigations and prosecutions; and ensuring that property is not removed, destroyed, or put to illegal use before the forfeiture hearing.

Ultimately, we need not reweigh the competing due process arguments advanced by the parties because this Court's

decisions in *United States* v. *$8,850*, 461 U. S. 555 (1983), and
*United States* v. *Von Neumann*, 474 U. S. 242 (1986), already
resolved the issue.   After a State seizes and seeks civil for-
feiture of personal property, due process requires a timely
forfeiture hearing but does not require a separate prelimi-
nary hearing.

The dispute in *$8,850* arose when the Customs Service
seized currency from an individual entering the United
States, but then waited before filing for civil forfeiture of the
currency.   See 461 U. S., at 558–561.   The property owner
argued that the delay violated due process.   See *id.*, at 562.

This Court concluded that a post-seizure delay "may be-
come so prolonged that the dispossessed property owner has
been deprived of a meaningful hearing at a meaningful
time."   *Id.*, at 562–563.   The Court elaborated that timeli-
ness in civil forfeiture cases must be assessed by "analog[iz-
ing] . . . to a defendant's right to a speedy trial" and consider-
ing four factors: the length of the delay, the reason for the
delay, whether the property owner asserted his rights, and
whether the delay was prejudicial.   *Id.*, at 564 (citing *Barker*
v. *Wingo*, 407 U. S. 514, 530 (1972)).   Those factors are ap-
propriate guides in the civil forfeiture context, the Court ex-
plained, because the factors ensure that "the flexible require-
ments of due process have been met."   461 U. S., at 564–565.

In *Von Neumann*, the Court addressed whether a timely
forfeiture hearing, without more, provides the process that
is due in civil forfeiture cases.   See 474 U. S., at 249–251.
The property owner there failed to declare the purchase of
his new car upon driving it into the United States.   See *id.*,
at 245.   A customs official determined that the car was sub-
ject to civil forfeiture and seized it.   See *ibid.*   The plaintiff
filed a petition for remission of the forfeiture—in essence, a
request under federal law that the Federal Government ex-
ercise its discretion to forgive the forfeiture.   See *id.*, at
245–246.   The Government did not respond to that petition
for 36 days.   See *id.*, at 246.   The plaintiff sued, arguing

that the Government's 36-day delay in answering the remission petition violated due process. See *id.*, at 246–247.

Justice Brennan's opinion for the Court broadly held that due process did not require a pre-forfeiture-hearing remission procedure in the first place. See *id.*, at 249–251. Citing *$8,850*, the Court ruled that a timely "forfeiture proceeding, without more, provides the postseizure hearing required by due process" to protect the plaintiff's "property interest in the car." 474 U. S., at 249. The Court explained that the plaintiff's "right to a forfeiture proceeding" that meets the *$8,850* timeliness test "satisfies any due process right with respect to the car." 474 U. S., at 251. A separate remission hearing is not "constitutionally required." *Id.*, at 250.[2]

This Court's decisions in *$8,850* and *Von Neumann* resolve this case. As the Court stated in *Von Neumann*, a timely forfeiture hearing "satisfies any due process right" with respect to a "car" that has been seized for civil forfeiture. 474 U. S., at 251; see also *id.*, at 249. The Due Process Clause does not require a separate preliminary hearing.[3]

Culley and Sutton's argument for a separate preliminary hearing appears in many respects to be a backdoor argument for a more timely hearing so that a property owner with a good defense against forfeiture can recover her property more quickly. But the Court's precedents already require a timely hearing, and a property owner can of course raise *$8,850*-based arguments in an individual case to ensure a timely hearing.

——————

[2] At oral argument in *Von Neumann*, Justice O'Connor asked the United States whether the "forfeiture proceeding itself provides all the process that's due" to protect the "property interest in the car." Tr. of Oral Arg. in *United States* v. *Von Neumann*, O. T. 1985, No. 84–1144, p. 18. The United States answered, "that is our position." *Ibid.*; see also *id.*, at 26–27. The Court subsequently agreed with that position. See *Von Neumann*, 474 U. S., at 249–251.

[3] In this opinion, we do not address any due process issues related to civil forfeiture other than the question about a separate preliminary hearing.

Culley and Sutton (echoed by the dissent here) try to
brush aside *Von Neumann* on the ground that the statutory
remission procedure in that case was discretionary.   See 474
U. S., at 244, and n. 2 (citing 19 U. S. C. § 1618 (1982 ed., Supp.
III)); see also *post*, at 410–411 (SOTOMAYOR, J., dissenting).
But the discretionary nature of the remission procedure
played no role in the Court's constitutional analysis.   See
474 U. S., at 249–251.   Culley and Sutton also try to charac-
terize the language in *Von Neumann* as dicta.   We disagree.
The Court ruled for the Government in *Von Neumann* on
the ground that a timely "forfeiture proceeding, without
more, provides the postseizure hearing required by due proc-
ess" in civil forfeiture cases.   *Id.*, at 249.   No separate pre-
liminary hearing is constitutionally required.

Culley and Sutton also contend that *Mathews* v. *Eldridge*
should be the test for deciding when additional process is
due and that, under *Mathews*, a preliminary hearing would
be required in civil forfeiture cases.   424 U. S. 319 (1976).
But this Court decided *$8,850* and *Von Neumann* after *Ma-
thews*, yet in those two cases, the Court did not apply the
*Mathews* test.   In any event, there is no good reason to
think that the *Mathews* balancing test would yield a differ-
ent result here.   A timely forfeiture hearing protects the
interests of both the claimant and the government.   And an
additional preliminary hearing of the kind sought by peti-
tioners would interfere with the government's important
law-enforcement activities in the period after the seizure and
before the forfeiture hearing.

In arguing that the Constitution requires a preliminary
hearing, Culley and Sutton also point to this Court's Fourth
Amendment decisions in the criminal context.   That analogy
is flawed.   The Fourth Amendment requires that any person
who is arrested without a warrant be brought before a neu-
tral magistrate within 48 hours, absent extraordinary cir-
cumstances.   See *County of Riverside* v. *McLaughlin*, 500
U. S. 44, 53, 56–57 (1991).   But the Fourth Amendment hear-

ings are not adversarial, and they address only whether probable cause supports the arrestee's detention. See *Gerstein* v. *Pugh*, 420 U. S. 103, 119–122 (1975). Here, Culley and Sutton do not request a mere probable cause hearing of the kind described in *Gerstein*. Rather, they argue that the immediate seizure of property requires adversarial preliminary hearings, and they assert that those hearings must address their "affirmative defense" of innocent ownership. *Wallace* v. *State*, 229 So. 3d 1108, 1110 (Ala. Civ. App. 2017). Culley and Sutton therefore contend that the Due Process Clause requires more extensive preliminary procedures for the temporary retention of property than for the temporary restraint of persons. The Due Process Clause does not demand that incongruity. See *United States* v. *Monsanto*, 491 U. S. 600, 615–616 (1989).

Finally, the dissent here relies heavily on *United States* v. *James Daniel Good Real Property*, 510 U. S. 43. See *post*, at 412. There, this Court held that the government must ordinarily provide notice and a hearing before seizing real property that is subject to civil forfeiture. See 510 U. S., at 62. The Court emphasized that real property, unlike personal property, "can be neither moved nor concealed" during the forfeiture process. *Id.*, at 52–53; see also *id.*, at 56–57. That case did not purport to disturb the rule that the government may seize and retain personal property, such as a car, that is subject to civil forfeiture when the property otherwise could be removed, destroyed, or concealed before a forfeiture hearing. See *id.*, at 57 (citing *Calero-Toledo*, 416 U. S., at 679). And more to the point, that case did not alter *Von Neumann*'s holding that a timely forfeiture hearing provides the process that is due following the immediate seizure of personal property.

In sum, *Von Neumann* held that a timely forfeiture hearing satisfies due process in civil forfeiture cases, and *$8,850* specified the standard for when forfeiture hearings are timely. Culley and Sutton have not asked the Court to dis-

card those precedents in this case. And those precedents make crystal clear that due process does not require a separate preliminary hearing before the forfeiture hearing.

B

Historical practice reinforces the holdings of *$8,850* and *Von Neumann* that due process does not require preliminary hearings in civil forfeiture cases.

Since the Founding era, statutes have authorized the Government to seize personal property and hold it pending a forfeiture hearing, without a separate preliminary hearing. For example, the first federal forfeiture law, the Collection Act of 1789, authorized the civil forfeiture of ships, goods, and merchandise involved in suspected violations of the customs laws. See, *e. g.*, Act of July 31, 1789, ch. 5, §§ 12, 22–24, 34, 1 Stat. 29, 39, 42–43, 46; see generally C. Nelson, The Constitutionality of Civil Forfeiture, 125 Yale L. J. 2446, 2464–2466 (2016). The Act's forfeiture process began with the seizure of property by a customs collector. See, *e. g.*, § 25, 1 Stat. 43. The collector then filed a forfeiture action, which a court would "hear and determine . . . according to law." § 36, *id.*, at 47. While that action was pending, the seized property could "remain in the custody of the collector." § 25, *id.*, at 43. A claimant could also recover the property on bond. See § 36, *id.*, at 47.

The Collection Act did not require a separate preliminary hearing before the forfeiture hearing. Rather, the forfeiture "trial" supplied the opportunity for the property owner to challenge the collector's case. *Ibid.*

In 1790 and 1799, Congress revised and reenacted the Collection Act. See Act of Mar. 2, 1799, ch. 22, 1 Stat. 627; Act of Aug. 4, 1790, ch. 35, 1 Stat. 145. The revised versions of the Act contained similar forfeiture provisions and likewise lacked anything resembling a separate preliminary hearing. See, *e. g.*, Act of Mar. 2, 1799, §§ 69, 89, 1 Stat. 678, 695–696; Act of Aug. 4, 1790, §§ 49, 67, 1 Stat. 170, 176–177.

Many state forfeiture statutes from the Founding period similarly did not require a preliminary hearing before the forfeiture hearing.  See, *e. g.*, Act of Apr. 11, 1787, ch. 81, in 2 Laws of the State of New York Passed at the Sessions of the Legislature Held in the Years 1785, 1786, 1787 and 1788, Inclusive, pp. 514–515, 517–520 (1886); Act of Oct. 1785, ch. 14, in 12 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, pp. 46–47 (1823).  For example, a New York customs statute from that era provided that a property owner could recover his seized goods by either prevailing at a forfeiture "trial" or executing a "bond" for an appraised amount.  Act of Apr. 11, 1787, at 517–518.  The statute did not allow property owners to challenge the validity of the seizure through a separate preliminary hearing or any similar procedure.  See *id.*, at 517–520.

In addition, when the Fourteenth Amendment was ratified in 1868, Congress did not require preliminary hearings.  In 1864, for example, Congress provided that goods seized under a new revenue law should "remain" in the "care and custody" of the government "until final judgment" in a forfeiture trial.  Act of Mar. 7, 1864, ch. 20, §2, 13 Stat. 14, 15.  Although that revenue law provided for bond, it did not grant property owners a right to preliminary hearings.  See *ibid.*  Similarly, in 1866, Congress required that goods and vessels seized under a new customs law "remain in the custody" of a customs official pending "adjudication by the proper tribunal."  Act of July 18, 1866, ch. 201, §31, 14 Stat. 178, 186.

Many state forfeiture laws from around the time of the Fourteenth Amendment likewise did not provide for a preliminary hearing.  For example, a New Hampshire statute required that a state official "detain" personal property that was seized for civil forfeiture until the property was "legally disposed of" through either bond or a forfeiture trial.  The General Statutes of the State of New-Hampshire, ch. 249,

§§ 3, 6–7, pp. 503–504 (1867). Likewise, a Vermont statute authorized the seizure of liquor that was intended for sale, required the seizing officer to "keep" the liquor "until final action is had thereon," and limited the conditions in which a claimant could recover the liquor. The Revised Laws of Vermont, 1880, § 3818, p. 738 (1881); see § 3827, *id.*, at 740.

Petitioners and their *amici* do not identify any federal or state statutes that, before the late 20th century, required preliminary hearings in civil forfeiture cases. To be sure, some States have recently enacted laws requiring preliminary hearings in civil forfeiture cases. See, *e. g.*, Ala. Act 2021–497, p. 9; 2021 Minn. Laws pp. 2064–2065; 2017 Ill. Laws pp. 6854–6855; 2017 Wis. Laws p. 815; 2012 Colo. Sess. Laws pp. 856–857; 2001 N. C. Sess. Laws p. 1159. But those recent laws do not support a constitutional mandate for preliminary hearings in every State.

In short, both Congress and the States have long authorized law enforcement to seize personal property and hold it until a forfeiture hearing. The absence of separate preliminary hearings in civil forfeiture proceedings—from the Founding until the late 20th century—is weighty evidence that due process does not require such hearings. Cf. *United States* v. *Ursery*, 518 U. S. 267, 274, 287–288 (1996); *Bennis* v. *Michigan*, 516 U. S. 442, 446–448 (1996); *Calero-Toledo*, 416 U. S., at 680–690. The historical practice in civil forfeiture proceedings thus reinforces *$8,850* and *Von Neumann*: In civil forfeiture cases involving personal property such as cars, the Due Process Clause requires a timely forfeiture hearing but does not require a preliminary hearing.

*     *     *

To balance the interests of the government and individuals in civil forfeiture cases involving personal property, the States and Congress have adopted a wide variety of approaches. For example, some States require that the forfeiture hearing occur within a fixed period of time. Others

require a jury trial. Still others condition civil forfeiture on a successful criminal prosecution. And a few now require preliminary hearings. See Brief for State of Georgia et al. as *Amici Curiae* 5–21.

Our decision today does not preclude those legislatively prescribed innovations. Rather, our decision simply addresses the baseline protection of the Due Process Clause.

In civil forfeiture cases, the Due Process Clause requires a timely forfeiture hearing, but does not require a separate preliminary hearing. We affirm the judgment of the U. S. Court of Appeals for the Eleventh Circuit.

*It is so ordered.*

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

I agree with the Court that, at a minimum, the Due Process Clause requires a prompt hearing in civil forfeiture cases. *Ante*, at 384. I agree that no legal authority presented to us indicates a prompt hearing must necessarily take the form Ms. Culley and Ms. Sutton suppose. *Ante*, at 385–386. I agree, too, that *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), does not teach otherwise. *Ante*, at 388. Under its terms, judges balance "the private and governmental interests at stake," *Mathews*, 424 U. S., at 340, to determine "what procedures the government must observe" when it seeks to withhold "benefits" "such as welfare or Social Security," *Nelson* v. *Colorado*, 581 U. S. 128, 141 (2017) (ALITO, J., concurring in judgment). That test does not control—and we do not afford any particular solicitude to "governmental interests"—in cases like this one where the government seeks to deprive an individual of her private property. But if all that leads me to join today's decision, I also agree with the dissent that this case leaves many larger questions unresolved about whether, and to what extent, contemporary civil forfeiture practices can be squared with the Constitution's promise of due process. I write separately to highlight some of them.

## I

The facts of this case are worth pausing over because they are typical of many. Halima Culley, a Georgia resident, bought a 2015 Nissan Altima for her son to use while he was away studying at the University of South Alabama. App. 58, ¶¶22–24. The car belongs to her and she pays for its registration and insurance. *Ibid.*, ¶¶25–26. The plan was for her son to bring the car home during the summer for the family to share. *Id.*, at 60, ¶37. But before that could happen, a police officer in Alabama pulled her son over and arrested him for possessing marijuana and drug paraphernalia. *Id.*, at 59, ¶27. The officer also took the car. *Ibid.*, ¶28. Eventually, law enforcement officials learned that the Nissan belonged to Ms. Culley, not her son. But instead of returning it, they initiated civil forfeiture proceedings in the hope of keeping the vehicle permanently. *Ibid.*, ¶¶30–33. It took a lawsuit and a 20-month wait for the car to make its way back to her. App. to Pet. for Cert. 3a.

For Alabama, this was business as usual. Often, the State's law enforcement agencies may take and keep private property without a warrant or any other form of prior process. Ala. Code §20–2–93(d) (Cum. Supp. 2023). Instead, only after taking the property must the agency file a civil forfeiture action in court. Once there, the agency need present only a "prima facie" case that the property in question represents proceeds "traceable" to a drug crime or property used to "facilitate" one. §§20–2–93(b)(3), (b)(5); *Ex parte McConathy*, 911 So. 2d 677, 681 (Ala. 2005). If the agency proves just that much, the burden sometimes shifts to the property's owner to prove she was an "innocent owner" who did not know about or consent to the conduct that caused the property to be taken. §§20–2–93(w), (a)(4). Should the agency prevail in the end, it may keep the property for its own use or sell it and keep the money. §20–2–93(s).

Laws like Alabama's exist in many States and at the federal level. But as commonplace as these civil forfeiture laws may be, most are pretty new. As part of the War on Drugs, in the 1970s and 1980s Congress began enacting sweeping new civil forfeiture statutes allowing the government to seize and keep the proceeds of drug crimes and the personal property used to facilitate them. See S. Cassella, Asset Forfeiture Law in the United States § 2–4, p. 48 (3d ed. 2022). Since then, the federal government has extended similar civil forfeiture rules to most federal offenses. *Id.*, at 49. Today, it appears, "[w]hite-collar and firearms crimes" now "accoun[t] for larger shares of all [federal] forfeitures than drug crimes." L. Knepper, J. McDonald, K. Sanchez, & E. Pohl, Policing for Profit: The Abuse of Civil Asset Forfeiture 26 (3d ed. 2020) (Knepper). Following the federal government's lead, many States have adopted similar laws of their own. See *id.*, at 170–185.

These new laws have altered law enforcement practices across the Nation in profound ways. My dissenting colleagues catalogue a number of examples, see *post*, at 405–408 (opinion of SOTOMAYOR, J.), but consider just a few here. To secure a criminal penalty like a fine, disgorgement of illegal profits, or restitution, the government must comply with strict procedural rules and prove the defendant's guilt beyond a reasonable doubt. *In re Winship*, 397 U. S. 358, 363 (1970). In civil forfeiture, however, the government can simply take the property and later proceed to court to earn the right to keep it under a far more forgiving burden of proof. See Knepper 39. In part thanks to this asymmetry, civil forfeiture has become a booming business. In 2018, federal forfeitures alone brought in $2.5 billion. *Id.*, at 15. Meanwhile, according to some reports, these days "up to 80% of civil forfeitures are not accompanied by a criminal conviction." Brief for Buckeye Institute as *Amicus Curiae* 14 (Buckeye Brief).

Law enforcement agencies have become increasingly dependent on the money they raise from civil forfeitures. The federal government shares a large portion of what it receives with state and local law enforcement agencies that aid its forfeiture efforts. Dept. of Justice & Dept. of Treasury, Guide to Equitable Sharing for State, Local, and Tribal Law Enforcement Agencies 3, 12 (Mar. 2024). At one time or another, "[o]ver 90% of the agencies serving jurisdictions with populations" above 250,000 have participated in this "equitable sharing" scheme. E. Jensen & J. Gerber, The Civil Forfeiture of Assets and the War on Drugs: Expanding Criminal Sanctions While Reducing Due Process Protections, 42 Crime & Delinquency 421, 425 (1996). And it seems that, when local law enforcement budgets tighten, forfeiture activity often increases. B. Kelly, Fighting Crime or Raising Revenue? Testing Opposing Views of Forfeiture 15 (2019).

Not only do law enforcement agencies have strong financial incentives to pursue forfeitures, those incentives also appear to influence how they conduct them. Some agencies, for example, reportedly place special emphasis on seizing low-value items and relatively small amounts of cash, hopeful their actions won't be contested because the cost of litigating to retrieve the property may cost more than the value of the property itself. See Knepper 9. Other agencies seem to prioritize seizures they can monetize rather than those they cannot, posing for example as drug dealers rather than buyers so they can seize the buyer's cash rather than illicit drugs that hold no value for law enforcement. See Buckeye Brief 7–8.

Delay can work to these agencies' advantage as well. See Brief for Institute for Justice et al. as *Amici Curiae* 16. Faced with the prospect of waiting months or years to secure the return of a car or some other valuable piece of property they need to work and live, even innocent owners sometimes "settle" by "paying a fee to get it back." Knepper 36. Contributing to the inducement to settle is how little proof the

GORSUCH, J., concurring

agencies must produce to win forfeiture, the cost of litigation, and the need to appear in court—sometimes, as Ms. Culley learned, in a different State. And if these tactics and burdens work against all affected individuals, can it be any surprise "the poor and other groups least able to defend their interests" often suffer most? *Leonard* v. *Texas*, 580 U. S. 1178, 1180 (2017) (statement of THOMAS, J., respecting denial of certiorari); see *post*, at 406–407.

## II

To my mind, the due process questions surrounding these relatively new civil forfeiture practices are many. Start with the most fundamental one. The Fifth and Fourteenth Amendments guarantee that no government in this country may take "life, liberty, or property, without due process of law." As originally understood, this promise usually meant that a government seeking to deprive an individual of her property could do so only *after* a trial before a jury in which it (not the individual) bore the burden of proof. See, *e. g.*, 1 W. Blackstone, Commentaries on the Laws of England 134–135 (1765) (Blackstone); *Vanhorne's Lessee* v. *Dorrance*, 2 Dall. 304, 315 (CC Pa. 1795) (Paterson, J.); *Wilkinson* v. *Leland*, 2 Pet. 627, 657 (1829) (Story, J.). So how is it that, in civil forfeiture, the government may confiscate property first and provide process later?

The answer, if there is one, turns on history. If, as a rule, the Due Process Clauses require governments to conduct a trial before taking property, some exceptions are just as deeply rooted. And for just that reason, these exceptions, too, may be consistent with the original meaning of the Fifth and Fourteenth Amendments. As this Court has put it, "a process of law . . . must be taken to be due process of law" if it enjoys "the sanction of settled usage both in England and in this country." *Hurtado* v. *California*, 110 U. S. 516, 528 (1884); see, *e. g.*, *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 278–280 (1856).

But can contemporary civil forfeiture practices boast that kind of pedigree? In *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663 (1974), this Court noted that English and early American admiralty laws allowed the government to seize a vessel involved in "piratical" or other maritime offenses and later initiate postdeprivation civil forfeiture proceedings. *Id.*, at 684. The Court observed that similar legal rules existed for cases involving "objects used in violation of the customs and revenue laws." *Id.*, at 682; see also K. Arlyck, The Founders' Forfeiture, 119 Colum. L. Rev. 1449, 1466 (2019). After emphasizing the existence of those traditions, the Court proceeded to uphold the civil forfeiture of a boat. *Calero-Toledo*, 416 U. S., at 682, 690. Later and proceeding on much the same basis, the Court approved various aspects of civil forfeiture practice in the context of customs enforcement actions. See *United States* v. *$8,850*, 461 U. S. 555, 562, n. 12 (1983); *United States* v. *Von Neumann*, 474 U. S. 242, 249, n. 7 (1986).

These historical traditions suggest that postdeprivation civil forfeiture processes in the discrete arenas of admiralty, customs, and revenue law may satisfy the Constitution. But as the Court stressed in *Von Neumann*, "the general rule" remains that the government cannot " 'seize a person's property without a *prior* judicial determination that the seizure is justified.' " *Id.*, at 249, n. 7. And it is far from clear to me whether the postdeprivation practices historically tolerated inside the admiralty, customs, and revenue contexts enjoy "the sanction of settled usage" outside them. *Hurtado*, 110 U. S., at 528.

The reasons for the law's traditionally permissive attitude toward civil forfeiture in those three contexts may merit exploration, too. From a brief look, it seems they were sometimes justified for reasons particular to their fields. In the early Republic, for example, once a ship involved in violations of the Nation's piracy or customs laws slipped port for a foreign destination, American courts often could not exercise

jurisdiction over it or its crew, let alone its owners. See R. Waples, Proceedings in Rem § 19, p. 22 (1882) (Waples). In many instances, the law recognized that seizing the ship, subject to postdeprivation procedures, represented "the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party." *Harmony* v. *United States*, 2 How. 210, 233 (1844) (Story, J.); see also 3 Blackstone 262 (1768) (justifying civil forfeiture in customs cases as necessary "to secure such forfeited goods for the public use, though the offender himself had escaped the reach of justice"). But if history sanctions that line of thinking, it's hard not to wonder: How does any of that support the use of civil forfeiture in so many cases today, where the government *can* secure personal jurisdiction over the wrongdoer? And where seizing his property is *not* the only adequate means of addressing his offense?

Even supposing some modern civil forfeiture regimes are able to claim the sanction of history, I wonder whether all their particulars might. In the past, it seems the government could confiscate only certain classes of property. So, for example, admiralty statutes regularly authorized the government to seize and pursue the civil forfeiture of "the instrument[s] of the offence," say, a ship used to engage in piracy. *Smith* v. *Maryland*, 18 How. 71, 75 (1855); see *Harmony*, 2 How., at 233. But statutes like that did not necessarily mean forfeiture extended to the vessel's cargo, and courts were loath to assume they did. *Id.*, at 235. Today, by contrast, civil forfeiture statutes routinely permit governments to confiscate not just instruments used in an offense, but other "facilitating" property as well. See *supra*, at 395. (In this respect, Alabama's statute is again illustrative.) And if that difference seems a small one, it is anything but: It is the difference between being able to confiscate the materials and equipment used to produce an illicit drug and being able to confiscate someone's car after he used it as the site to conduct a single drug transaction as either buyer or

seller. See *Austin* v. *United States*, 509 U. S. 602, 627–
628 (1993) (Scalia, J., concurring in part and concurring in
judgment).

Even in the areas where the law tolerated civil forfeiture,
earlier generations tempered some of its harshest features.
Courts, for example, ordinarily entertained "overwhelming
necessity" as a defense to "the violation of revenue laws"
that might otherwise justify forfeiture. 1 J. Bishop, Com-
mentaries on the Criminal Law § 697, p. 575 (1856) (Bishop);
see *Peisch* v. *Ware*, 4 Cranch 347, 363 (1808) (Marshall, C. J.)
("[A] forfeiture can only be applied to those cases in which
the means that are prescribed for the prevention of a forfeit-
ure may be employed"). Some statutes permitted the
owner to avoid forfeiture by proving that the violation "pro-
ceeded from accident or mistake." 1 Stat. 677; see *United
States* v. *Nine Packages of Linen*, 27 F. Cas. 154, 157
(No. 15,884) (CC NY 1818); Bishop § 697, at 575; cf. 3 Stat. 183
(no forfeiture of goods from "bona fide purchaser"). Others
empowered the Treasury Secretary himself to afford the
same remedy—and evidence suggests officials "were exceed-
ingly liberal in their use of the . . . power, granting relief
in the overwhelming majority of cases presented to them."
Arlyck, 119 Colum. L. Rev., at 1487; see also *The Laura*, 114
U. S. 411, 414–415 (1885). These days, meanwhile, many
civil forfeiture statutes lack some or all of these mitigating
features. I acknowledge that this Court has suggested an
innocent owner defense is not always constitutionally re-
quired. *Bennis* v. *Michigan*, 516 U. S. 442, 443 (1996); see
*id.*, at 455–457 (THOMAS, J., concurring) (discussing limits to
the Court's holding); *id.*, at 457–458 (Ginsburg, J., concurring)
(same). But even putting that debate aside, what of early
forfeiture's other ameliorative attributes?

It appears, too, that time was often of the essence in tradi-
tional civil forfeiture practice. So, for example, an early fed-
eral statute permitting forfeiture for nonpayment of internal
duties "enjoined" the "collector" "to cause suits for [forfeit-

ure] to be commenced without delay, and prosecuted to effect." 3 Stat. 242. In an admiralty case, Chief Justice Marshall remarked, "If the seizing officer should refuse to institute proceedings to ascertain the forfeiture, the district court may, upon the application of the aggrieved party, compel the officer to proceed to adjudication, or to abandon the seizure." *Slocum* v. *Mayberry*, 2 Wheat. 1, 10 (1817). And in many instances owners could recover their property while the forfeiture proceedings were ongoing by posting a bond. See, *e. g.*, 3 Stat. 242; *United States* v. *Ames*, 99 U. S. 35, 36 (1879); Waples §81, at 112; *ante*, at 391. It's another feature of historic practice that raises questions about current ones in which even innocent owners can wait for months or years for forfeiture proceedings to play out.

### III

Why does a Nation so jealous of its liberties tolerate expansive new civil forfeiture practices that have "led to egregious and well-chronicled abuses"? *Leonard*, 580 U. S., at 1180 (statement of THOMAS, J.). Perhaps it has something to do with the relative lack of power of those on whom the system preys. Perhaps government agencies' increasing dependence on forfeiture as a source of revenue is an important piece of the puzzle. Cf. *Calero-Toledo*, 416 U. S., at 679 (indicating, over 50 years ago and before the rise of many modern innovations, that "self-interes[t]" did not motivate the forfeiture of the vessel at issue). But maybe, too, part of the reason lies closer to home. In this Nation, the right to a jury trial before the government may take life, liberty, or property has always been the rule. Yes, some exceptions exist. But perhaps it is past time for this Court to examine more fully whether and to what degree contemporary civil forfeiture practices align with that rule and those exceptions.

Really, it's hard not to wonder whether some current civil forfeiture practices represent much less than a revival of the

archaic common-law deodand.  The deodand required the
forfeiture of any object responsible for a death—say, a knife,
cart, or horse—to the Crown.  See 1 Blackstone 290.
Today, the idea seems much the same even if the practice
now sweeps more broadly, requiring almost any object in-
volved in almost any serious offense to be surrendered to the
government in amends.

The hardships deodands often imposed seem more than
faintly familiar, too.  Deodands required forfeiture regard-
less of the fault of the owner, himself sometimes the de-
ceased.  Not infrequently, the practice left impoverished
families without the means to support themselves, faced not
only with the loss of a loved one but also with the loss of a
horse or perhaps a cart essential to their livelihoods.  See 2
F. Pollock & F. Maitland, The History of English Law 472
(1895); E. Burke, Deodand—A Legal Antiquity That May
Still Exist, 8 Chi.-Kent L. Rev. 15, 17, 19–20 (1930).  Some-
times grieving families could persuade authorities or juries
to forgo a deodand, but often not, and generally the burden
to avoid a deodand was on them.  See M. Foster, Crown Law
266 (1762).

As time went on, too, curiously familiar financial incentives
wormed their way into the system.  Originally, the Crown
was supposed to pass the deodand (literally, a thing given to
God) onto the church "as an expiation for the sou[l]" of the
deceased.  1 Blackstone 290.  Over time, though, the Crown
increasingly chose instead to sell off its rights to deodands
to local lords and others.  These recipients inevitably wound
up with a strong interest in the perpetuation of the enter-
prise.  See *id.*, at 292.  Ultimately, the deodand's appeal
faded in England, and this Court has held that it "did not
become part of the common-law tradition of this country."
*Calero-Toledo*, 416 U. S., at 682; see *id.*, at 681, n. 19.  But
has something not wholly unlike it gradually reemerged in
our own lifetimes?

SOTOMAYOR, J., dissenting

\*

In asking the questions I do today, I do not profess a comprehensive list, let alone any firm answers. Nor does the way the parties have chosen to litigate this case give cause to supply them. But in future cases, with the benefit of full briefing, I hope we might begin the task of assessing how well the profound changes in civil forfeiture practices we have witnessed in recent decades comport with the Constitution's enduring guarantee that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

A police officer can seize your car if he claims it is connected to a crime committed by someone else. The police department can then keep the car for months or even years until the State ultimately seeks ownership of it through civil forfeiture. In most States, the resulting proceeds from the car's sale go to the police department's budget. Petitioners claim that the Due Process Clause requires a prompt, post-seizure opportunity for innocent car owners to argue to a judge why they should retain their cars pending that final forfeiture determination. When an officer has a financial incentive to hold onto a car and an owner pleads innocence, they argue, a retention hearing at least ensures that the officer has probable cause to connect the owner and the car to a crime.

Today, the Court holds that the Due Process Clause never requires that minimal safeguard. In doing so, it sweeps far more broadly than the narrow question presented and hamstrings lower courts from addressing myriad abuses of the civil forfeiture system. Because I would have decided only which due process test governs whether a retention hearing is required and left it to the lower courts to apply

that test to different civil forfeiture schemes, I respectfully dissent.

## I

### A

Civil forfeiture occupies a murky space between criminal forfeiture and ordinary government deprivations of property. Criminal forfeiture is part of a defendant's criminal punishment. The government must therefore proceed against the person (*in personam*) to obtain someone's property via criminal forfeiture, which generally requires notice of intent to forfeit the property in a criminal indictment and full criminal procedural protections for the defendant. At the outset, the government must typically prove that it has probable cause to seize the person for a specific crime and therefore to hold any property related to that crime. See *Gerstein* v. *Pugh*, 420 U. S. 103 (1975).

Outside the criminal context, the government usually must provide a hearing before depriving someone of essential property. See, *e. g.*, *Goldberg* v. *Kelly*, 397 U. S. 254, 264–266 (1970) (public assistance); *Bell* v. *Burson*, 402 U. S. 535, 542–543 (1971) (driver's license); *Fuentes* v. *Shevin*, 407 U. S. 67, 96–97 (1972) (household goods to which a creditor lays a claim). In some circumstances "the necessity of quick action by the State" may prevent a predeprivation hearing. *Parratt* v. *Taylor*, 451 U. S. 527, 539 (1981), overruled on other grounds, *Daniels* v. *Williams*, 474 U. S. 327 (1986). Then, however, the government must make "availab[le] . . . some meaningful means by which to assess the propriety of the State's action at some time after the initial [seizure], [to] satisfy the requirements of procedural due process." 451 U. S., at 539.

Civil forfeiture is a hybrid, where prosecutors proceed against any property (*in rem*) they believe is connected to a crime, even when the owner is innocent. Unlike criminal forfeiture, civil forfeiture proceedings are untethered from

any criminal prosecution. In fact, as many as 80% of civil forfeitures are not accompanied by any ultimate criminal conviction. Brief for Buckeye Institute as *Amicus Curiae* 14. Civil forfeiture is unnecessary where the government pursues criminal forfeiture in an indictment and sustains a conviction. Only if an officer seizes property that he believes is connected to a crime, but does not belong to a defendant charged with that crime, must prosecutors bring civil forfeiture proceedings outside a criminal case. Even when the State abandons the prosecution that formed the basis for the seizure, an innocent property owner can be left in civil forfeiture proceedings trying to get her property back.

B

The Federal Government, States, and localities set their own rules for civil forfeiture, subject only to the limits of the Due Process Clause. This lack of standardized procedural safeguards makes civil forfeiture vulnerable to abuse. In 32 States and the federal system, when law enforcement agencies forfeit property, the proceeds go to their own budgets. Brief for Institute for Justice et al. as *Amici Curiae* 4. As a result, police agencies often have a financial incentive to seize as many cars as possible and try to retain them. The forfeiture revenue is not a supplement; many police agencies in fact depend on cash flow from forfeitures for their budgets. See, *e. g.*, J. Worrall & T. Kovandzic, Is Policing for Profit? Answers From Asset Forfeiture, 7 Criminology & Pub. Pol'y 219, 222 (2008) ("[M]ore than 60% of police agencies surveyed reported dependence on asset forfeiture"). These cash incentives not only encourage counties to create labyrinthine processes for retrieving property in the hopes that innocent owners will abandon attempts at recovery, they also influence which laws police enforce, how they enforce them, and who they enforce them against. See Brief for Buckeye Institute as *Amicus Curiae* 6–20 (detailing empirical studies

on the effect of fiscal incentives in civil forfeiture on law enforcement decisionmaking).

Police officers have an incentive to enforce the law in a way that leads to the recovery of fungible property, like cash or cars. For example, officers might pose as drug dealers instead of buyers in a sting operation, because "it allows police to seize a buyer's cash rather than a seller's drugs (which have no legal value to the seizing agency)." E. Blumenson & E. Nilsen, Policing for Profit: The Drug War's Hidden Economic Agenda, 65 U. Chi. L. Rev. 35, 67 (1998). Similarly, police officers might target low-level drug possession in cars instead of drug transactions on the street, so that they can seize the vehicle. In this case, police officers pulled over petitioner Halima Tariffa Culley's college-age son while he was driving a car registered to her, charged him with possession of marijuana, and seized the car. A police officer cannot sell recovered marijuana and a prosecutor's office does not ordinarily pursue low-level marijuana offenses. When a police department can recover the proceeds from a car civilly forfeited in connection to a low-level marijuana offense, however, targeting that offense becomes more appealing.

Moreover, officers have a financial incentive to target marginalized groups, such as low-income communities of color, who are less likely to have the resources to challenge the forfeiture in court. See A. Crawford, Civil Asset Forfeiture in Massachusetts: A Flawed Incentive Structure and Its Impact on Indigent Property Owners, 35 Boston College J. L. & Soc. Justice 257, 274–277 (2015) ("[O]ne way for law enforcement agencies to generate profits is to target low-income parties who are financially incapable of challenging seizures"). A 2019 study found that "the seizure of nonnarcotic property from black and Hispanic arrestees increases with the size of the [budget] deficit in states where police departments can retain revenue from seized property." M. Makowsky, T. Stratmann, & A. Tabarrok, To Serve and Collect:

SOTOMAYOR, J., dissenting

The Fiscal and Racial Determinants of Law Enforcement, 48 J. Legal Studies 189, 208–209.

"[T]hese same groups are often the most burdened by forfeiture," because "they are more likely to suffer in their daily lives while they litigate for the return of a critical item of property, such as a car." *Leonard* v. *Texas*, 580 U. S. 1178, 1180 (2017) (statement of THOMAS, J., respecting denial of certiorari). For many people, loss of access to a car, even temporarily, is significant. Over 85% of Americans drive to work. J. Hirsch & P. Jones, Driver's License Suspension for Unpaid Fines and Fees: The Movement for Reform, 54 U. Mich. J. L. Reform 875, 881 (2021). Unsurprisingly, studies have found a link between the inability to drive and the loss of a job. For example, "[i]n New Jersey, 42% of people lost their jobs after their driver's license was suspended." *Ibid.* Loss of a car not only "takes away one's ability to commute" but also imposes a barrier to "buy[ing] necessities, access[ing] healthcare, and visit[ing] family members, pharmacies, grocery stores, hospitals, and other essential services." *Ibid.*

Given these burdens, low-income communities are also the most vulnerable to pressure from unchecked prosecutors, who can use coercive civil forfeiture processes to extract settlement money from innocent owners desperate to get their property back. See Brief for Institute for Justice et al. as *Amici Curiae* 19–20 (detailing examples). In Detroit, to take one example, car owners recently alleged that Wayne County seizes vehicles in areas generally associated with crime and holds on to the vehicles and their contents unless the owners pay steep redemption fees: $900 for the first seizure; $1,800 for the second; and $2,700 for the third. See *Ingram* v. *Wayne Cty.*, 81 F. 4th 603, 606 (CA6 2023). If the owner is unwilling or unable to pay this fee, she must either abandon the vehicle or wait for county prosecutors to decide whether to initiate forfeiture proceedings. Before such proceedings are brought, however, the owner allegedly must at-

tend four or more pretrial conferences during regular work hours, during which the owner typically will not get to plead her case to a judge. Instead, prosecutors will attempt to persuade her to pay the redemption fee, towing costs, and storage fees. Missing just one conference allegedly will result in automatic forfeiture and transfer of title to the county.

Similarly, in Massachusetts, one investigation found over 500 instances in a single county where law enforcement held property for a decade or more before officials finally commenced forfeiture proceedings. S. Datar & S. Dooling, Massachusetts Police Can Easily Seize Your Money. The DA of One County Makes It Nearly Impossible To Get It Back, ProPublica (Aug. 18, 2021), www.propublica.org/article/ massachusetts-police-can-easily-seize-your-money.-the-da-of-one-county-makes-it-near-impossible-to-get-it-back. In other words, those owners had to wait more than a decade for the chance to explain to a judge why they should get their property back. In one instance, prosecutors ran a newspaper notice four years after a seizure, at which point the property owner had only 20 days to file a claim to avoid forfeiture. Similar delays have been reported in South Carolina, Oklahoma, and Pennsylvania. See Brief for Institute for Justice et al. as *Amici Curiae* 16 (collecting studies).

In short, law enforcement can seize cars, hold them indefinitely, and then rely on an owner's lack of resources to forfeit those cars to fund agency budgets, all without any initial check by a judge as to whether there is a basis to hold the car in the first place.

## II

This Court granted certiorari to address which of its tests should govern due process challenges that seek a retention hearing after an officer seizes a car.[1] Now, the Court

_____

[1] See Pet. for Cert. i ("In determining whether the Due Process Clause requires a state or local government to provide a post seizure probable cause hearing prior to a statutory judicial forfeiture proceeding and, if so,

reaches far beyond that question to hold that people whose cars are seized by the police never have a due process right to a retention hearing. The Court arrives at this conclusion by relying on two customs cases from the 1980s and historical practice that purportedly reinforces their application. Its reasoning is deeply flawed.

A

The majority says that "[t]his Court's decisions in *$8,850* and *Von Neumann* resolve this case." *Ante,* at 387. These cases, however, have little to say about what due process requires when an innocent owner seeks to retain her car pending an ultimate forfeiture determination in schemes like those described above. Instead, the claimants in these cases argued that the United States Customs Service took too long to resolve forfeiture proceedings against property seized at the border as part of the claimants' own alleged violations of customs law.

In *United States* v. *$8,850*, 461 U. S. 555, 558 (1983), a customs inspector seized $8,850 in cash from Mary Josephine Vasquez, who had declared she was carrying less than $5,000. Vasquez was charged with a felony and a misdemeanor, with the indictment seeking forfeiture of the $8,850 as part of the misdemeanor charge. When a jury ultimately convicted Vasquez of only the felony count, which did not contain the forfeiture allegations, the Government finally filed civil forfeiture proceedings against the cash. Vasquez argued only that the Government's 18-month delay in filing civil forfeiture proceedings was unconstitutionally long. To evaluate her claim, the Court borrowed the *Barker* v. *Wingo* multifac-

when such a hearing must take place, should district courts apply the 'speedy trial' test employed in *United States v. $8,850*, 461 U. S. 555 (1983) and *Barker v. Wingo*, 407 U. S. 514 (1972), as held by the Eleventh Circuit or the three-part due process analysis set forth in *Mathews v. Eldridge*, 424 U. S. 319 (1976) as held by at least the Second, Fifth, Seventh, and Ninth Circuits").

tor test from the speedy-trial context and held that "the balance of factors indicate[d] that the Government's delay . . . was reasonable" in the circumstances. 461 U. S., at 569; see *id.*, at 564 (citing *Barker* v. *Wingo*, 407 U. S. 514 (1972)). In so holding, the Court emphasized that the Government had "diligent[ly]" pursued the pending criminal proceedings against Vasquez. 461 U. S., at 568. Because a conviction on the misdemeanor count could have rendered civil forfeiture unnecessary, the Government's delay in filing a civil forfeiture proceeding was understandable. *Ibid.*

In *United States* v. *Von Neumann*, 474 U. S. 242, 245 (1986), Von Neumann failed to declare a newly purchased Jaguar Panther car to customs officials when he drove it back to the United States. United States Customs seized the car, and Von Neumann filed a petition for administrative remission proceedings the same day. Two weeks later, he posted a bond and regained possession of the car. Thirty-six days after he filed his remission petition, Customs resolved it by reducing Von Neumann's penalty for failure to declare to $3,600.

Von Neumann argued that the 36-day delay in responding to his administrative remission petition violated due process. The Government responded that "due process considerations do not govern the Secretary's disposition of [administrative] remission petitions." *Id.*, at 249. The Court agreed with the Government. "Implicit in this Court's discussion of timeliness in *$8,850* was the view that the [regular civil] forfeiture proceeding, without more, provides the postseizure hearing required by due process to protect Von Neumann's property interest in [his] car." *Ibid.* The administrative proceedings did not trigger a separate due process right, the Court continued, because they were discretionary and "not *necessary* to a forfeiture determination." *Id.*, at 250.

The Court then declined to address the argument that the remission statute "itself creates a property right which cannot be taken away without due process." *Ibid.* "[E]ven if

respondent had such a property right," the Court explained, "any due process requirement of timely disposition was more than adequately provided here." *Ibid.* The Court had "already noted that his right to a forfeiture proceeding meeting the *Barker* test satisfies any due process right with respect to the car and the money." *Id.*, at 251. Von Neumann had also failed to show "what prejudice [he] suffered from the 36-day delay in the response" to his remission petition. *Id.*, at 250.

The majority takes *Von Neumann*'s imprecise categorical language out of this vital context to hold that "a timely forfeiture hearing 'satisfies any due process right' with respect to a 'car' that has been seized for civil forfeiture." *Ante*, at 387 (quoting *Von Neumann*, 474 U. S., at 251).[2] In doing so, it extends the holdings of both *Von Neumann* and *$8,850* to situations neither Court contemplated. In both, the Government sought to forfeit property tied to the claimants' unlawful conduct. The claimants were not, and did not claim to be, innocent owners of property used for criminal ends without their knowledge. Unlike petitioners here, neither the claimant in *$8,850* nor the claimant in *Von Neumann* had argued that a retention hearing was necessary to test Customs' justification for seizing their property at the outset. Instead, both argued only that the Government took too long to resolve their proceedings: in *$8,850* through a statutory process, and in *Von Neumann* through a discretionary administrative one. The majority's reading here improperly resolves a constitutional challenge that the Court in those cases had no cause or reason to address.

B

With the sole exception of the Eleventh Circuit, every court of appeals has rejected *Von Neumann*'s application to

---

[2] Perhaps recognizing that it stretches the reasoning of the opinion, the majority relies in a footnote on statements made at oral argument. See *ante*, at 387, n. 2.

state and county civil forfeiture schemes concerning claimants' cars.[3] Indeed, this Court has distinguished *Von Neumann* in contexts where officers have a financial incentive to seize property and owners may assert innocence of the underlying crime as a defense. In *United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 46 (1993), for example, this Court held that the Government must conduct a predeprivation hearing before it seizes real property connected to criminal conduct through civil forfeiture. Four years after James Daniel Good pleaded guilty to state charges based on drugs found in his home, the Federal Government filed civil forfeiture proceedings against his home. Even though Good did not assert innocence, the Court emphasized that proceedings without a predeprivation hearing created an unacceptable risk of error for property owners asserting an "innocent owner" defense, because waiting until the final forfeiture hearing "'would not cure the temporary deprivation that an earlier hearing might have prevented.'" *Id.*, at 56. Crucial to the Court's reasoning was the fact that "the Government has a direct pecuniary interest in the outcome of the proceeding" when it is entitled to forfeit the property. *Id.*, at 55–56.

This reasoning applies directly to due process challenges where police seize the cars of innocent owners and use forfeiture proceeds to fund department budgets. The narrow holdings of *$8,850* and *Von Neumann* should not determine the due process claims of every claimant deprived of access to her car by state prosecutors on untested grounds for months or years.

———————

[3] See *Ingram* v. *Wayne Cty.*, 81 F. 4th 603, 616–617 (CA6 2023); *Serrano* v. *CBP*, 975 F. 3d 488, 500 (CA5 2020) (*per curiam*); *Smith* v. *Chicago*, 524 F. 3d 834, 837–838 (CA7 2008), vacated as moot, *Alvarez* v. *Smith*, 558 U. S. 87 (2009); *Krimstock* v. *Kelly*, 306 F. 3d 40, 52, n. 12 (CA2 2002) (Sotomayor, J.); cf. *Booker* v. *St. Paul*, 762 F. 3d 730 (CA8 2014) (declining to reference *Von Neumann*).

## III

The majority's categorical rule that due process never requires a retention hearing also cannot be squared with the context-specific analysis that this Court's due process doctrine requires. "'[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 895 (1961) (alteration in original). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972).

The Court granted this case to resolve which of two flexible due process tests should govern, not to resolve whether due process ever requires a retention hearing in civil forfeiture schemes. That difference is important. An appropriately context-specific due process test should not always yield the same result when applied to different schemes. Of the six Circuits that have applied the test from *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), to various civil forfeiture schemes, three have held that due process requires a retention hearing, *Ingram*, 81 F. 4th, at 620; *Smith* v. *Chicago*, 524 F. 3d 834, 838 (CA7 2008), vacated as moot, *Alvarez* v. *Smith*, 558 U. S. 87 (2009); *Krimstock* v. *Kelly*, 306 F. 3d 40, 67–68 (CA2 2002) (Sotomayor, J.), and three have held that it does not, *Serrano* v. *CBP*, 975 F. 3d 488, 500–502 (CA5 2020) (*per curiam*); *Booker* v. *St. Paul*, 762 F. 3d 730, 736–737 (CA8 2014); *United States* v. *One 1971 BMW*, 652 F. 2d 817, 820–821 (CA9 1981). That result is consistent with the flexible dictates of any due process test, which should take into account all the component parts of an individual scheme.

For instance, petitioners had the right to post a bond to get back their vehicles, the right to move for summary judgment in the forfeiture proceeding itself, and the opportunity to seek separate relief under the Alabama Rules of Criminal Procedure for an illegal seizure. The adequacy of those al-

ternative procedures was never briefed below because the
only question was which test should apply.  By contrast, the
New York City scheme that the Second Circuit concluded
violated due process lacked all of those procedures.  See
*Krimstock*, 306 F. 3d, at 55, 59–60.  Differences in the ade-
quacy of available procedures can and should result in differ-
ent due process outcomes.

    Instead of answering the question presented and then re-
manding to the lower court to apply the appropriate test,
the majority instead holds that due process never requires
a retention hearing.  The majority acknowledges that "the
States and Congress have adopted a wide variety of ap-
proaches."  *Ante*, at 392.  Yet it prescribes a categorical
constitutional rule for all of them.  The Court today ham-
strings federal courts from conducting a context-specific
analysis in civil forfeiture schemes that are less generous
than the one here.

## IV

    The majority's holding relates only to retention hearings.
It does not foreclose other potential due process challenges to
civil forfeiture proceedings.  See *ante*, at 387, n. 3.  People
who have their property seized by police remain free to chal-
lenge other abuses in the civil forfeiture system.  For in-
stance, such claimants could challenge notice of a forfeiture
posted only in a newspaper, the lack of a neutral adjudicator
at an initial hearing, or the standard of proof necessary to
seize a car.  Lower courts remain free to apply *Mathews* to
those claims.  See *ante*, at 388.  Due process also still "re-
quires a *timely* post-seizure forfeiture hearing," *ante*, at 384,
so claimants may continue to challenge unreasonable delays.[4]

---

[4] Courts applying the *Barker* factors to due process challenges of unrea-
sonable delay should not apply a narrower version of that test than the
one this Court articulated in *$8,850*.  The *$8,850* Court emphasized that
*Barker* is a "flexible" test, and "none of [its] factors is a necessary or
sufficient condition for finding unreasonable delay."  *United States* v.
*$8,850*, 461 U. S. 555, 564–565 (1983); see also *Barker* v. *Wingo*, 407

SOTOMAYOR, J., dissenting

The abuses of many civil forfeiture systems are well documented. See, *e. g.*, *supra*, at 405–408. I commend States or localities that have adopted retention hearings as a way of guarding against those abuses. See, *e. g.*, Brief for Legal Aid Society as *Amicus Curiae* (detailing the benefits of New York City's prompt postseizure hearings). Other States and localities should not view today's decision as precluding them from following suit and adopting similar measures.

*          *          *

The majority today holds that due process never requires the minimal check of a retention hearing before a police officer deprives an innocent owner of her car for months or years. Given the diverse schemes adopted by States, some with adequate safeguards and some without, the Court should have just answered the question presented. Instead, it announces a universal rule for all schemes without heeding the dictates of this Court's due process precedents that require a scheme-specific analysis. Because I instead would have answered the question presented and left lower courts the flexibility to apply the appropriate test in these myriad circumstances, I respectfully dissent.

U. S. 514, 533 (1972) ("[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process"). The factors are merely "guides in balancing the interests of the claimant and the Government to assess whether the basic due process requirement of fairness has been satisfied in a particular case." *$8,850*, 461 U. S., at 565. In the civil forfeiture context, "the balance of the interests, which depends so heavily on the context of the particular situation, may differ from a situation involving the right to a speedy trial." *Ibid.*, n. 14. Recognizing that the *Barker* and *Mathews* balancing tests have similar aims and factors, the Government notes that the tests are not necessarily mutually exclusive. See Brief for United States as *Amicus Curiae* 20–22.

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None